**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **RUTH J. LANE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:05-0364** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's Application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401 - 433. This case is presently pending before the Court on Plaintiff's

Motion for Judgment on the Pleadings filed on July 25, 2005 (Document No. 10.), and Defendant's

Motion for Judgment on the Pleadings filed on August 22, 2005 (Document No. 13.). The Court has

further considered Plaintiff's Response to Defendant's Memorandum in Support of her Motion for

Judgment on the Pleadings filed on August 25, 2005. (Document No. 15.) Both parties have

consented in writing to a decision by the United States Magistrate Judge.

The Plaintiff, Ruth J. Lane (hereinafter referred to as "Claimant"), initially filed an

Application for DIB on January 21, 2003, alleging disability as of July 2, 1999, due to carpal tunnel

syndrome; bursitis and tendonitis of the left shoulder; arthritis of the spine; bone spurs, bursitis and

gout in her feet; fibromyalgia and lupus; pain as a consequence of these conditions; depression and

anxiety . (Tr. at 64 - 66, 83.) The claim was denied initially and upon reconsideration.  (Tr. at 36 -

38, 43 - 44.)  On September 5, 2003, Claimant requested a hearing before an ALJ (Tr. at 46.), and

the hearing was held on April 21, 2004, before the Honorable Karen B. Peters.  (Tr. at 224 - 265.) By Decision dated May 18, 2004, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13 - 20.) Claimant requested review of the ALJ's Decision, and the ALJ's decision became the final decision of the Commissioner on April 21, 2005, when the Appeals Council denied Claimant's request for review.  (Tr. at 5 - 8.) On April 29, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (1999).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The

burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (1999). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>     (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

3

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. at 19, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of "fibromyalgia, diabetes mellitus, lupus, obesity, post carpal tunnel surgery on the left side, carpal tunnel on the right side, depression, GERD, and occasional gout". (Tr. at 19, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's medically determinable impairments did not meet or medically equal the level of severity of any listing in Appendix 1, Subpart P, Regulation No. 4. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for performing "sedentary work with mildly reduced use of the hands for fine manipulation, mildly reduced concentration, and occasional posturals." (Tr. at 19, Finding No. 6.) Thus, the ALJ concluded that Claimant could perform a significant range of sedentary work. (Tr. at 20, Finding No. 11.) The ALJ found that Claimant could not perform any of her past relevant work. (Tr. at 20, Finding No. 7) The ALJ determined that Claimant was a "younger individual" with a high school education and no transferable skills. (Tr. at 20, Finding Nos. 8 - 10.) Nevertheless, the ALJ concluded that Claimant could perform jobs including work as a cashier which existed in significant numbers in the regional and national economy. (Tr. at 20, Finding No 12.) On this basis, benefits were denied. (Tr. at 20.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence.  Hays v.Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the decision of the Commissioner in this case is in conformity with all applicable legal standards and supported by substantial evidence.

Claimant's Background

Claimant was born on January 20, 1956, and was 48 years old at the time of the administrative hearing, April 21, 2004. (Tr. at 64, 227.) Claimant has a high school education. (Tr. at 89, 228.)  In the past, she worked as a seamstress.  (Tr. at 84, 230.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

6

<u>Claimant's Challenges to the Commissioner's Decision and the Commissioner's Response</u>

Claimant first asserts that the Commissioner's decision is not supported by substantial evidence because "there is actually no analysis in this record to explain the Commissioner's decision." (Document No. 11.) Claimant contends that the ALJ did not discuss how her severe impairments, singly and in combination, affected her residual functional capacity. Claimant further contends that the ALJ improperly accepted the questionable opinions of two State agency consultants and rejected the opinions of Claimant's treating physician, Dr. Raza, respecting her physical residual functional capacity. Second, citing <u>Grimmett v. Heckler</u>, 607 F.Supp. 502 (S.D.W.Va. 1985), Claimant asserts that the ALJ improperly rejected the conclusions of Mr. William Brezinski, the only opinions of record respecting Claimant's mental impairment supported by test results, in view of Claimant's activities of daily living, and "played psychologist."[1] Finally, Claimant contends that the ALJ improperly relied upon the vocational expert's response to one of three

---

[1] In *Grimmett v. Heckler*, 607 F.Supp. 502 (S.D.W.Va. 1985), the ALJ found that Mr. Grimmett was capable of medium work and could perform his prior work as the owner/operator of a service station. It appears that the record contained the psychiatric and psychological evaluations of Dr. McNeer and Mr. Brezinski an no other opinions respecting Mr. Grimmett's mental condition. Reversing and remanding the matter, District Judge Staker stated as follows:

> Without seeking other expert opinion, the ALJ chose to discredit the psychiatric and psychological evidence based on his conclusion that plaintiff 'had no prior history of mental impairment or emotional problem . . . he has not been hospitalized or treated for a psychiatric disorder [and] the examining psychiatrist did not recommend any further treatment or medication for the claimant.' In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional. [Citations omitted.] The absence of any treatment for impairments as serious as those described by Dr. McNeer and Mr. Brezinski may provide a basis for questioning the severity of the impairments, however, a finding to this effect must be based on medical evidence, not the opinion of a layperson. On remand, if the Secretary questions the validity of these reports, she ought to secure a consultative examination.

hypothetical questions premised upon the opinions of the State agency consultants that work as a cashier was available and rejected the vocational expert's responses to two further hypothetical questions premised upon the opinions of Dr. Raza and Mr. Brezinski that no work was available.

The Commissioner responds that objective medical evidence and Claimant's statements respecting her activities of daily living support the ALJ's conclusions respecting Claimant's residual functional capacity and her ability to perform work determined to be available. (Document No. 14.) The Commissioner states that the ALJ considered the opinions of the State agency consultants that Claimant could perform light work and nevertheless concluded that Claimant could perform work at the sedentary level. The Commissioner further states that the ALJ considered Claimant's subjective reports of her symptoms including pain and assessed her credibility in reaching her conclusion respecting Claimant's residual functional capacity. Addressing Claimant's assertions respecting the ALJ's rejection of the opinions of Dr. Raza and Mr. Brezinski, the Commissioner argues essentially that the ALJ's consideration of their opinions is in conformity with applicable law and regulations and supported by substantial evidence.

In her Response to Defendant's Memorandum in Support of her Motion for Judgment on the Pleadings (Document No. 15.), Claimant contends that the Commissioner "does not address the basis of [her] arguments." (Emphasis on document.) Claimant states that (1) nothing in the record supports the ALJ's determination that she was capable of sedentary work; (2) the Commissioner did not address the circumstances which render the opinions of the State agency consultants questionable; (3) the Commissioner does not explain how evidence which the ALJ rejected was inconsistent with the record and Claimant's activities of daily living, and in any event, daily activities merely in caring for herself are not indicative of her ability to engage in substantial gainful activity attaching the

8

January 30, 2004, Order of District Judge Jackson L. Kiser and the January 14, 2004, Report and Recommendation of Magistrate Judge Waugh Crigler in <u>Milam v. Barnhart</u>, Case No. 4:03CV000025, in the United States District Court for the Western District of Virginia[2]; and (4) the Commissioner offers reasons in support of the ALJ's rejection of the opinions of Mr. Brezinski gathered from the record as a whole though there was no evidence from any other medical source contradicting Mr. Brezinski's opinions.

---

[2] In *Milam v. Barnhart*, The ALJ determined that Mr. Milam suffered from a severe back disorder for which he had surgery and which prevented him from performing his past relevant work. The ALJ further determined that Mr. Milam had the ability to perform light work with restrictions and jobs existed in the economy which he could perform. Magistrate Judge Crigler noted that Mr. Milam's treating physician opined that Mr. Milam was unable to return to work; yet, the ALJ relied upon a DDS physician's report and Mr. Milam's daily activities in 2000 when he had surgery "which essentially amounted to nothing more than caring for himself" to conclude that Mr. Milam was capable of light work with restrictions. Recommending remand, Magistrate Judge Crigler stated as follows:

> The undersigned has made these observations concerning the Law Judge's conclusions about plaintiff's residual functional capacity, and eventually about whether jobs were available notwithstanding his general credibility and his severe impairments, because they rested on the DDS consulting physician's report and plaintiff's daily activities. In that regard, a claimant's daily activities that amount merely to caring for oneself, including household activities and the like, are not to be considered substantial gainful activity. 20 C.F.R. § 404.1572(c). This is so because, to be relevant, a claimant's daily activities must have some connection to those performed in a vocational setting where, *inter alia*, production constraints are present. By the same token, the Commissioner may consider evidence of daily activities as a factor in determining the intensity and persistence of symptoms and the extent to which those symptoms may limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(3)(I). Whether a Law Judge may elevate such 'a' factor under the regulation essentially to controlling status, of course, will depend on the circumstances of the case.
>
> * * *
>
> Here, plaintiff's daily activities squarely fit the regulatory description of those which cannot be considered as substantial gainful activity, particularly in light of the treating source evidence indicating plaintiff's inability to work.

9

ANALYSIS

Essentially, Claimant is contending that the ALJ erred at steps four and five of the sequential analysis in considering the opinions of Dr. Raza and Mr. Brezinski, assessing her residual functional capacity and determining through the testimony of a vocational expert whether work was available in the national economy which she could perform.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions."  See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a); 416.945(a) (2003).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2003).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Regulations establish a framework for determining the weight to be given to the opinions of

medical sources respecting the severity of claimants' impairments and residual functional capacities. The Regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(d). In evaluating the opinions of treating physicians, the ALJ generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2)(2000). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55(W.D.Va. 1996); see also, 20 C.F.R. 404.1527(d)(2)(2000). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(d)(2)(2000). Ultimately, it is the responsibility of the ALJ, not the Court, to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the ALJ's conclusions are rational. Oppenheimer v. Finch, 495 F.2d 396,397 (4th Cir. 1994).

Social Security Ruling 96-2p, 1996 WL 374188 (S.S.A.), reiterates the standard for considering medical opinions of treating sources stating when the ALJ must adopt the opinions of treating sources on the issue(s) of the nature and severity of claimants' impairments as follows:

> The [regulatory] provision recognizes the deference to which a treating source's medical opinion should be entitled. It does not permit us to substitute our own judgment for the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.

According to SSR 96-2p, the medical opinions of treating sources must be given controlling weight

when they meet four factors: (1) they must be opinions of "treating sources"; (2) they must be "medical opinions", i.e., opinions about the nature and severity of claimants' impairments; (3) the ALJ must find them "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques; and (4) even if well-supported, the opinions must be "not inconsistent" with the other "substantial evidence" in the individual's case record. SSR 96-2p states further as follows:

> It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not.

If the ALJ determines that a  treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. § 416.927(d)(2).

Generally speaking with respect to medical opinions, the ALJ gives more weight to opinions of treating physicians than to those of examining and non-examining physicians. 20 C.F.R. § 404.1527. As between the opinions of examining and non-examining physicians, the ALJ will generally give more weight to the opinion of examining physicians. 20 C.F.R. § 404.1527(d)(1). Opinions of medical experts are accorded the same treatment as that given non-examining sources. 20 C.F.R. § 1527(f)(2)(iii).

The ALJ must accompany his decision with sufficient explanation to allow a reviewing Court to determine whether the Commissioner's decision is supported by substantial evidence. "[T]he [Commissioner] is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [his] decision a statement of the reasons for that decision." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge . . . ." Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The United States Court of Appeals for the Fourth Circuit has stated that in Social Security cases, "[w]e cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to *all* of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) (emphasis added). Quoting its decision in a prior case, the Court stated as follows:

> The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence
>
> approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

Id. at 236 (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)). In Gordon, the claimant was examined by several doctors. See id. at 235. The Secretary, in determining that the claimant was capable of sedentary work, relied upon the testimony of a non-examining medical advisor, Dr. Bruce. See id. In remanding the case, the Fourth Circuit noted that neither the ALJ nor the Appeals Council indicated the weight attributed to the various medical reports submitted by the claimant,

some of which supported Dr. Bruce's testimony and some of which did not. See id. at 235-36. Thus, the ALJ had not indicated the weight given to *all* of the evidence analyzed.

In Murphy v. Bowen, 810 F.2d 433 (4th Cir. 1987), the Fourth Circuit discussed the issue of an ALJ choosing between two sharply divided pieces of medical evidence. In Murphy, the Social Security claimant applied for disability on the basis of, among other things, "lack of education." Id. at 435. The claimant's medical record contained two conflicting psychological evaluations performed by clinical psychologists. See id. One psychologist, Dr. Andrews, found that claimant had a full-scale IQ of 71, suffered from only mild retardation, and had no psychological or personality disorders. See id. at 435-37. The other psychologist, Dr. Rudin, strongly disagreed with the findings of Dr. Andrews. See id. Dr. Rudin used different tests in evaluating the claimant, and criticized the tests used by Dr. Andrews as less reliable. See Murphy, 810 F.2d at 435. Dr. Rudin found that the claimant had a full-scale IQ of only 63, and found evidence of "psychotic tendencies, lack of contact with reality, and a strong suggestion of schizophrenia or schizoid personality disorder." Id. At the claimant's administrative hearing, a vocational expert testified that with an IQ score no lower than 71, there would be jobs claimant could perform, given his residual functional capacity, but with an IQ of 63, and some other added limitations, there would be no such jobs. See id. at 436. The ALJ found, based upon the evidence, that the claimant retained the residual functional capacity to return to his past relevant work as a groundskeeper. See id. The Fourth Circuit found, on the available record, "little or no indication why the ALJ credited Dr. Andrews' views over those of Dr. Rudin." Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987). The Court held that "[i]n the face of such a sharp division in medical evidence, it is simply unacceptable for the ALJ to adopt one diagnosis over another without addressing the underlying conflict." Id.

Having determined a claimant's residual functional capacity and found that the claimant cannot perform her past relevant work, the ALJ must consider whether the claimant is disabled under the Vocational Guidelines or, to the extent that non-exertional limitations are presented, submit a hypothetical question to a vocational expert respecting the existence of work in the regional and national economies which the claimant can perform. To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and the ALJ must present a hypothetical question which fairly sets out all of the claimant's impairments and abilities. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments and limitations, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The record in this case contains documents indicating that Claimant was seen and/or treated by Dr. Sheila J. Brooks, a podiatrist, Dr. Quasir Raza and Dr. William Harden from May 29, 2002 through May 5, 2003. (Tr. at 158 - 195.) The record further indicates that Claimant was "followed" by Dr. Ahmad, a rheumatologist, beginning in November, 2002. (Tr. at 123, 125, 142, 164, 238 - 239.) Claimant indicates that Dr. Ahmad prescribed medications for fibromyalgia, pain and depression. (Tr. at 123.) The record, however, does not contain any medical records respecting Dr. Ahmad's treatment of Claimant.

15

The record contains the Residual Functional Capacity Assessment of a DDS physician dated February 28, 2003. (Tr. at 133 - 142.) The DDS physician determined that Claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk and sit for about six hours in an eight-hour workday and had unlimited ability to push and pull. The doctor further found that Claimant could occasionally climb, balance, stoop, kneel, crouch and crawl. The doctor indicated that she was limited in handling, fingering and feeling with her right hand and unlimited in these respects with her left hand. The doctor indicated that Claimant should avoid concentrated exposure to extreme heat and cold and work hazards. The doctor appears to indicate that Claimant experienced no restrictions in her activities of daily living. (Tr. at 138.) The record also contains the Physical Residual Functional Capacity Assessment of a DDS physician dated July 7, 2003. (Tr. at 196 - 203.) The DDS physician's Assessment is the same as the DDS physician's February 28, 2003, Assessment.

On October 12, 2003, Dr. Raza completed a Medical Assessment of Ability to do Work-Related Activities (Physical). (Tr. at 213 - 216.) Dr. Raza determined, as the DDS physicians had, that Claimant could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. He found that Claimant could stand and walk and sit about four hours in an eight-hour day. He found that Claimant could sit for forty minutes and stand about thirty minutes before needing to change position and needed to shift from sitting to standing/walking at will and sometimes needed to lie down. He indicated that Claimant could occasionally climb, balance, stoop, kneel and crawl and never crouch. He indicated that Claimant's ability to handle and push/pull were affected by her impairments and her ability to reach, feel, see hear and speak were not. Finally, Dr. Raza concluded that Claimant's impairments or treatment would cause her to be absent from work about three times

a month.

The record contains a Psychiatric Review Technique form completed by Dr. Rosemary Smith on March 11, 2003. (Tr. at 143 - 156.) Dr. Smith found that Claimant suffered from depression and anxiety which she deemed not severe. She determined that Claimant was mildly restricted in her activities of daily living and her ability to maintain social functioning and concentration, persistence or pace and had no episodes of decompensation of extended duration. (Tr. at 153.) Dr. Smith noted that "Claimant is on psychotropic medication prescribed by her treating physician for depression and anxiety." (Tr. at 155.) She also noted that Claimant's activities of daily living included "self care, cooks, does some light chores, pays bills, shops, reads, watches TV, listens to music, occasionally sews and quilts, visits." (Id.)

Mr. William A. Brezinski, M.A., conducted an evaluation of Claimant on October 6, 2003, which included psychological testing. (Tr. at 204 - 208.) Mr. Brezinski also completed a Mental Residual Functional Capacity Assessment form. (Tr. at 209 - 212.) Mr. Brezinski diagnosed dysthymic disorder and obsessive compulsive disorder. He found that there was no evidence of limitation respecting Claimant's understanding and memory; her ability to carry out very short and simple instructions; her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. He found no significant limitation in Claimant's ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. He found that she was

17

moderately limited in her ability to carry out detailed instructions; make simple work-related decisions; accept instructions and respond appropriately to criticism by supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He found that Claimant was markedly limited in her ability to maintain attention and concentration for extended periods and complete a normal word day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. The record also includes a July 2, 2004, letter from Mr. Brezinski to Claimant's counsel by which Mr. Brezinski provides additional information respecting his diagnosis of obsessive compulsive disorder in view of the ALJ Peters' findings. (Tr. at 222 - 223.) Mr. Brezinski states that "DSM-IV indicates that OCD, by definition, must cause marked distress, be time consuming, or significantly interfere with an individual's normal routine, occupational functioning, or usual social activities or relationships with others." He further indicates that Claimant engages in personal activities notwithstanding her obsessive compulsive disorder by accommodation of family members and her personal activities are not evidence of her ability to function in the work environment where such accommodation would not exist. Finally, Mr. Brezinski states that Claimant's lack of metal health treatment is not evidence that her impairment is not serious because "many individuals with OCD do not recognize that the obsessions or compulsions are excessive or unreasonable."

ALJ Peters began her evaluation of the evidence by summarizing Claimant's testimony respecting her prior employment as a sewing machine operator, symptoms including pain and

activities of daily living. (Tr. at 15.)[3] She then considered the reports of Dr. Raza and Mr. Brezinski

respecting Claimant's residual functional capacity stating as follows (Id.):

> The documentary evidence indicates Dr. Q. Raza evaluated claimant as significantly restricted from activity involving even minimal demands on a sustained basis in a commercially competitive environment. However, no documented impairment remotely supports deficits approaching that order of magnitude (i.e., lying down at frequent intervals, absence from work more than three times a week, etc.) other than self-reported problems. Likewise, W. Brezinski assessed 'markedly' impaired mental capacity for attention, concentration, completion of normal workday, and maintaining a consistent pace which are grossly inconsistent with claimant's routine daily activities. Such pursuits included church attendance, child care and recreational outings, sewing and care for an invalid mother, which belie dysfunctionality with respect to concentration, attention, reliability, and task completion. Drastically compromised mental facilities portrayed by Mr. Brezinski are similarly incongruent with a history of no mental health treatment or intervention. Very little weight is accorded the foregoing evidence, which is viewed as anomalous and unsubstantiated.

ALJ Peters went on to relate how " remaining documentary evidence considered in its entirety

coalesces to underscore only modest restrictions on a wide range of light exertional endeavor" and

the objective evidence corroborates Claimant's subjective complaints. (Tr. at 16.) She stated that

"[m]ental health concerns are largely reactionary and have prompted little motivation to seek

---

[3] Claimant indicated in applying for DIB that her personal activities and interests included doing laundry, dusting furniture, paying bills, washing dishes, running errands, shopping for food, clothes and medications, reading the newspaper, watching television and listening to records and tapes, sewing, quilting, bowling, gardening, walking and dancing. Claimant further stated that she drives when she goes out. She stated that her son and husband vacuumed and mopped and helped her with household chores. She doesn't walk much. She sews for a while until she experiences pain in her hands, and she no longer bowls, dances or gardens. (Tr. at 93 - 94.) Claimant stated that she visits in-laws two or three times a year. Friends visit her occasionally. She goes grocery shopping one or two times a week, takes her son to school every day and goes to the doctor for appointments. (Tr. at 95.) She stated further that she had trouble concentrating and completing tasks, chores and recreational activities. (Id.) Claimant completed an Activities of Daily Living form on May 17, 2003, stating that her husband and son depend upon her for "cooking, cleaning, shopping, etc. Normal things a wife and mother should do" and help her as they can in her activities. (Tr. at 97 - 101.) Claimant indicated the same on October 8, 2003. (Tr. at 122.) At the administrative hearing on April 21, 2004, Claimant testified that she tried to vacuum, do laundry, iron, sew and prepare meals and had some trouble driving to the extent that she had to look back. (Tr. at 243 - 247.)

counseling or clinical treatment." (Id.) ALJ Peters stated as follows respecting the two DDS residual

functional capacity assessments (Id.):

> The foregoing factors were both available and documented at the time by two
> independent non-examining state agency clinical consultations reaching virtually
> identical conclusions endorsing exertional capacity for nearly all manner of light
> exertional activity. However, claimant's daily routine consisting in no small part of
> cooking, laundering, vacuuming, dusting, mopping, household financial record
> keeping, shopping, driving, reading, watching television, listening to radio
> programming, sewing, quilting, outdoor excursions, and patronage of school events
> tends to more persuasively elaborate the degree of functional loss associated with
> various clinical conditions, which incidently have existed throughout most of the
> alleged period of disability. During most of the time period of claimed disability,
> claimant also provided daily care for her incapacitated mother who was on oxygen.
> Any questions raised or concerns presented by the combined impact of arthritic,
> connective tissue, and neurological pathology is conclusively resolved when
> complaints of intractable pain in almost every weight-bearing joint and skeletal
> structure are contrasted with the diverse range of daily activities claimant continues
> to voluntarily assume without apparent adverse effect. However, to negate all
> potential for symptom exacerbation should any question hereafter arise, further
> reduction of exertional demands incident to sustained work activity will be
> implemented.

ALJ Peters accepted Mr. Brezinski's diagnosis of dysthymic disorder and obsessive compulsive

disorder and concluded that "[n]either appear to be serious mental illnesses." (Id.) ALJ Peters

nevertheless found that depression was among Claimant's severe impairments and resulted in a mild

reduction in her ability to concentrate. (Tr. at 18.) Thus, ALJ Peters stated Claimant's residual

functional capacity as follows in the body of her decision (Id.):

> [T]he undersigned finds the claimant retains the residual functional capacity for
> sedentary work (giving her the benefit of the doubt as to exertional level) with mildly
> reduced use of the hands for fine manipulation, mildly reduced concentration and
> occasional posturals.

ALJ Peters posed the following hypothetical question to the vocational expert (Tr. at 262.):

> Let's assume a hypothetical individual of the Claimant's same age, education, and
> background as been described here today. And let's assume that this individual
> would have the ability to work at the sedentary exertional level with some additional

20

limitations. This individual would have a mild reduction in the use of the hands. Let's see. Assume they might have a mild reduction in concentration. This individual would only occasionally be able to climb, balance, kneel, crouch, crawl, and stoop.

The vocational expert stated that "[y]our hypothetical leaves intact a limited, yet viable occupational base essentially consisting of only one occupational cluster * * * cashiers of which there are 3,600 in Virginia and about 137,000 nationally." (Id.) ALJ Peters then asked the expert to consider Dr. Raza's assessment of Claimant's functional capacity, and the expert stated that no jobs existed. (Tr. at 263.) Claimant's attorney then asked the expert to consider Mr. Brezinski's assessment, and the expert indicated that no jobs existed. (Tr. at 264.)

The Court finds ALJ Peter's analysis and discussion of the evidence in conformity with applicable law and regulations and her conclusions supported by substantial evidence. ALJ Peters properly looked to the record as a whole in considering Dr. Raza's and Mr. Brezinski's opinions respecting Claimant's residual functional capacity including her activities of daily living and lack of mental health treatment and explained the inconsistency in rejecting the opinions. The evidence reflects that Claimant did not merely care for herself but rather cared for her mother when she was ill and her husband and son and they for her as she needed. Nothing supports Dr. Raza's opinion that Claimant needs to lie down from time to time except Claimant's statement that she occasionally takes naps during the day. Ample evidence exists in support of the ALJ's decision to reject Dr. Raza's and Mr. Brezinski's opinions to the extent that they indicate completely debilitating exertional and non-exertional limitations. Respecting the opinions of the two DDS physicians, the ALJ noted the availability of objective medical evidence at the time they made their assessments of Claimant's residual functional capacity. The ALJ's determination of Claimant's residual functional capacity is plainly an accommodation of all of the evidence of record including Claimant's

subjective report of her symptoms including pain. In consideration of Claimant's report, the ALJ determined that she was able to function occupationally at the sedentary level of exertion though the DDS physicians and Dr. Raza placed her at the light level. ALJ Peters determined that Claimant suffered from depression as a severe impairment and determined that Claimant had mild difficulties in concentration as a consequence of her mental disorders consistently with the opinion of Dr. Smith. Her findings in these regard are consistent with evidence that Claimant was prescribed psychotropic drugs and Dr. Smith's and Mr. Brezinski's opinions. The ALJ, therefore, quite properly accepted the opinion of the vocational expert on the basis of her first hypothetical question inasmuch as that question presented a hypothetical person with exertional and non-exertional limitations consistently with the record as a whole in this case.

After a careful examination of the evidence of record, the Court finds that the Commissioner's decision that Claimant is not entitled to DIB is in conformity with all applicable legal standards and supported by substantial evidence of record. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is **DENIED**, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: September 28, 2006.

R. Clarke VanDervort
United States Magistrate Judge

22